[No. C054495. Third Dist. Feb. 13, 2009.]

CITY OF STOCKTON, Plaintiff and Respondent, v.
MARINA TOWERS LLC et al., Defendants and Appellants.

**COUNSEL**

Matteoni, O'Laughlin & Hechtman, Norman E. Matteoni, Peggy M. O'Laughlin, Bradley M. Matteoni and Gerald Houlihan for Defendants and Appellants.

Freeman, D'Aiuto, Pierce, Gurev, Keeling & Wolf, Maxwell M. Freeman, Thomas H. Keeling, Arnold J. Wolf; and Richard E. Nosky, Jr., City Attorney, for Plaintiff and Respondent.

**OPINION**

**BUTZ, J.**—California's eminent domain law permits acquisition of property only for "a particular use," to wit: a "proposed project." (Code Civ. Proc., §§ 1240.020, 1240.030.)[1] A public entity desiring to condemn private property must pass a "resolution of necessity" (§ 1240.040) that describes the proposed project and contains findings that the proposed project is necessary for the greater public good (§ 1240.030).

This is a case of "condemn first, decide what to do with the property later." Soon after its city council passed nondescript, amorphous resolutions of necessity approving the condemnation of two parcels of land abutting the Stockton Deep Water Channel, plaintiff and respondent City of Stockton (City) filed this eminent domain action to acquire the property, then owned by defendants and appellants Marina Towers LLC et al. (collectively Marina).[2]

City obtained a prejudgment order for possession and acquired the property. Months later, while Marina was fiercely contesting City's right to condemn in court, City decided to build a parking lot and a baseball field on the property.

The case went to trial, where the trial court granted City's motion for nonsuit and overruled all of Marina's right-to-take objections. It also denied Marina any compensation for precondemnation activities. At the compensation phase, a jury fixed the market value of the property at $1.97 million.

Marina appeals from the judgment, contending that the trial court erred in granting nonsuit, in determining that the resolutions of necessity were not the

---

[1] Undesignated statutory references are to the Code of Civil Procedure.

[2] Additional defendants (including a trustee and beneficiaries under a deed of trust) were named in the eminent domain action as having a claim or some other interest in the subject property. All named defendants appeared in the action and they appeal, with the exception of Chicago Title Company. We refer to appellants collectively as "Marina."

product of a gross abuse of discretion, and in certain evidentiary rulings during the valuation phase of the trial.

We shall conclude that the project description in the resolutions of necessity was so vague, uncertain and sweeping in scope that it failed to specify the "public use" for which City sought acquisition of the property. This crucial defect precluded an intelligent inquiry into whether City had a legal right to condemn the property and fatally flawed the condemnation process. For this reason, Marina's challenge to the facial validity of the resolutions was meritorious and City had no right to take the property. We shall reverse with directions to order a conditional dismissal of the action. City will be responsible for Marina's litigation expenses, but it will have another opportunity to get it right.

## FACTUAL AND PROCEDURAL BACKGROUND[3]

The subject property consists of two parcels of real property on the North Shore of the Stockton Deep Water Channel. The east parcel (APN No. 137-240-04; res. No. 03-0589) was unimproved;[4] on the adjacent west parcel (APN No. 137-250-20; res. No. 03-0588) was a vacant office building.

Marina purchased the property in January 2000. A year later it applied to City's planning commission to renovate the office building. Marina also entered into negotiations with the County of San Joaquin to lease the building for office space.

*Events leading up to the resolutions of necessity*

In 1989, City adopted a Central Stockton Final Plan/Revitalization Plan. The plan presents itself as a visionary planning document for future development of the city center, with maps, charts and descriptions of possible development of the downtown area. In 1991, the subject property was added to the West End Redevelopment Project Area of downtown Stockton, and an environmental impact report (EIR) was certified for this purpose.

In 2003, City's Channel District Action Team (CDAT), consisting of staff representing various city departments and agencies, studied projects for

---

[3] Our factual summary is drawn not only from the trial court record, but portions of Marina's opening statement since, in granting the nonsuit, the trial court assumed that Marina would be able to prove all factual assertions set forth in the opening statement. (See *Mejia v. Community Hospital of San Bernardino* (2002) 99 Cal.App.4th 1448, 1457–1458 [122 Cal.Rptr.2d 233].) However, these factual statements are presented merely for background purposes; our decision is based solely on undisputed facts in the record.

[4] According to the City's complaint, the east parcel is actually two separate unimproved parcels. One assessor parcel number covers both parcels and throughout the proceedings below and in this appeal, the east parcel is referred to as one parcel.

redevelopment of the North Shore area, the most conspicuous of which was the Stockton Event Center, a multiuse complex that would include an arena, hotel, baseball stadium and residential apartments. These studies described the subject property as a "catalyst site" for City's revitalization efforts, to be assembled along with other city-owned properties. The planning boundary for the proposed event center was also expanded to include the west parcel of the Marina property and initial planning documents prepared by City staff designated the west parcel for high-density residential use.

By letter dated May 5, 2003 (all further unspecified calendar references are to that year), City notified Marina that it was considering acquisition of the property by eminent domain. In July, the city council passed a resolution adopting a preliminary site plan and authorizing the city manager to initiate applications for the Stockton Event Center. The resolution recites that an EIR for the project was currently being prepared. The draft EIR, as well as the proposed master plan for the event center project, called for a residential apartment complex on Marina's west parcel.

In August, City offered to purchase the subject property and served notice of intent to adopt resolutions of necessity. A hearing was held on September 30.

At the hearing, James Rinehart, project director of the CDAT, made the presentation. Consistent with the staff memorandum, Rinehart explained that City had been "preparing" this site for development, and described the subject property as within a "catalyst site" for North Shore revitalization.

Jeff Major appeared on behalf of Marina. He expressed Marina's willingness to work with City on developing the property and objected to the adoption of resolutions of necessity. Major asserted that the public interest and necessity did not require the taking of Marina's property, explaining that Marina was in negotiations with the county to lease the vacant building. Major stated that the only project plans he had seen for the property called for private apartments. He questioned how condemnation could benefit the public when the intent appeared to be to take the property from one private owner and give it to another. Despite Major's assertion that there was no defined project that necessitated the taking of Marina's property for public use, no one at the hearing identified a specific public project that was the object of the proposed taking.

At the conclusion of the September 30 hearing, the city council unanimously passed resolutions of necessity for both parcels. The resolutions contain identical language. After identifying the subject property, the resolution recites that (1) the "Proposed Project" consists of acquisition of additional land on the North Shore of the Stockton Deep Water Channel; (2) City

already owns approximately 20 acres on the North Shore and "has been preparing this site for development"; (3) the North Shore is a "catalyst site" consistent with redevelopment of a portion of the West End (Central Stockton) Redevelopment Project Area; (4) assembling the North Shore parcels, including this property, into a single parcel will eliminate irregularly shaped and undersized lots, permitting development of a larger and economically feasible use; and (5) the "Proposed Project" will complement other revitalization efforts and City will be a direct beneficiary of such efforts. Therefore, the city council resolved to take the property "pursuant to the authority granted by Sections 37350.5, 37352, 37353, 37501, and 54031 of the Government Code, and Sections 1240.010, et seq. and 1240.610, et seq. of the Code of Civil Procedure." These statutes represent a comprehensive list of public uses for which private property may be taken.

The resolutions recite that the project is "covered" under the EIR prepared for the West End Urban Renewal Project in 1991, but that "[f]urther environmental review will be required for any subsequent specific project that may be developed on this site."

*Litigation and postresolution events*

On October 6, less than a week after the resolutions were passed, City filed a complaint in eminent domain to acquire the Marina parcels, relying on the two resolutions. City also obtained a writ of immediate possession.

Marina answered, raising a number of affirmative defenses, including the defense that the proposed project was not a public use and that City's true intent was to transfer privately held land into the hands of a private developer. The answer also alleged the resolutions of necessity were defective on their face because they "fail to sufficiently identify the public use for which the property is to be condemned."

Marina moved to stay the order for prejudgment possession of the property. The court denied the motion, finding that Marina had not established a probability of prevailing on its objections.

In the months following the filing of this action, the event center project quickly gathered momentum. A series of agreements were entered into between the city council and the redevelopment agency to develop the Stockton Event Center on land that included the condemned parcels. In December 2003, three months after the resolutions were passed, an EIR for the Stockton Event Center was approved by the city council. It called for a ball park on the east parcel and residential apartments on the west parcel of the Marina property. The City even issued a conditional use permit to build a 72-unit apartment building on the west parcel.

On January 13, 2004, while this litigation was pending, the city council adopted a new resolution, designating the west parcel to be used for public parking. On March 2, 2004, City issued another supplemental resolution, designating a ball park as the public use for the east parcel. By the time trial had commenced on Marina's objections to the right to take, these projects had been built.

*Trial and judgment*

Trial on Marina's right-to-take objections commenced in April 2005. In her opening statement, counsel for Marina outlined a number of defenses she expected to be established by the evidence including (1) the acquisition did not serve a public purpose because City's true intent was to turn the property over to a private developer; only after litigation arose did City abandon the idea of transferring it to a private party; (2) the resolutions were invalid on their face because they did not identify a defined public use for which the property was to be condemned; (3) City violated the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.) by condemning the property before completion of an updated EIR; and (4) City acted unlawfully by condemning property located in a redevelopment zone without complying with the Community Redevelopment Law (Health & Saf. Code, § 33000 et seq.).

City moved for nonsuit at the conclusion of the opening statement. The court granted the motion. When Marina pointed out that the nonsuit motion did not address Marina's defense of gross abuse of discretion based on the administrative record, the court took the matter under submission. It subsequently issued a written decision rejecting Marina's claim that the city council abused its discretion in adopting the resolutions of necessity.

The court granted City's motion to bifurcate the issues of Marina's entitlement to precondemnation damages (see *Klopping v. City of Whittier* (1972) 8 Cal.3d 39 [104 Cal.Rptr. 1, 500 P.2d 1345])[5] and the valuation of the property.

After a bench trial, the trial court rejected Marina's claim that it was entitled to damages by virtue of City's unreasonable precondemnation activity.

At the valuation phase of trial, the jury found that Marina was entitled to $1,970,022 as compensatory damages for the acquisition of the property.

---

[5] Marina contended that it was entitled to precondemnation damages by virtue of City's unreasonable interference in lease negotiations between the County of San Joaquin and Marina for lease of the vacant office building.

Marina appeals from the final judgment.

## DISCUSSION

### I. Eminent Domain Overview

■ It is a cardinal principle of statutory and constitutional law that private property may only be taken for a *public* use. (Cal. Const., art. I, § 19; § 1240.010; see *Kelo v. New London* (2005) 545 U.S. 469, 477–478 [162 L.Ed.2d 439, 449–451, 125 S.Ct. 2655].)

In 1975, following an intensive study by the California Law Revision Commission, the Legislature adopted a comprehensive statutory scheme (§ 1230.010 et seq.) covering virtually every aspect of eminent domain law. (See 11 Miller & Starr, Cal. Real Estate (3d ed. 2002) Eminent Domain, § 30A:2, pp. 3–4 (Miller & Starr).) As section 1230.020 succinctly states, "Except as otherwise specifically provided by statute, the power of eminent domain *may be exercised only as provided in this title*." (Italics added.)

■ Section 1240.030 specifies that property may be taken for "a proposed project" if three things have been established: "(a) The public interest and necessity require the project. [¶] (b) The project is planned or located in the manner that will be most compatible with the greatest public good and the least private injury. [¶] (c) The property sought to be acquired is necessary for the project." No public entity may condemn property unless it has first adopted a resolution of necessity that meets all statutory requirements. (§ 1240.040.)

Section 1245.230 specifies the contents of the resolution of necessity: The first requirement is "[a] general statement of the public use for which the property is to be taken and a reference to the statute that authorizes the public entity to acquire the property by eminent domain." (§ 1245.230, subd. (a).) The resolution must also contain findings that the three statutory elements of section 1240.030 have been satisfied, to wit: The public interest and necessity require the *project*; the *project* is planned in the manner most compatible with the greatest public good; and the property sought to be acquired is necessary for the *project*. (§ 1245.230, subd. (c); see § 1240.030, subds. (a)–(c).)

A resolution of necessity may not be adopted until the public entity gives notice to the affected parties and holds hearings at which evidence must be considered to support the requisite findings. (§ 1245.235; 11 Miller & Starr, *supra*, Eminent Domain, § 30A:14, pp. 18–20.)

A valid resolution of necessity is clothed with a strong presumption of finality. Thus, section 1245.250, subdivision (a) provides that "a resolution of

necessity adopted by the governing body of the public entity pursuant to this article *conclusively establishes* the matters referred to in Section 1240.030 [public interest and necessity require project; planning of project is compatible with public good; and property is required for project]." (Italics added.) However, "[a] resolution of necessity *does not* have the effect prescribed in Section 1245.250 to the extent that its adoption or contents were influenced or affected by gross abuse of discretion by the governing body." (§ 1245.255, subd. (b), italics added; see *Redevelopment Agency v. Norm's Slauson* (1985) 173 Cal.App.3d 1121, 1127 [219 Cal.Rptr. 365] (*Norm's Slauson*).)

## II. Community Redevelopment Law and Identification of "The Project"

Before considering the sufficiency of the resolutions of necessity in this case, we must first pause to note the unique intersection between the Eminent Domain Law (§ 1230.010 et seq.) and California's Community Redevelopment Law.

In 1945, the Legislature passed the California Redevelopment Act to address problems of urban blight. The provisions of the act are found in California's Community Redevelopment Law (CRL) (Health & Saf. Code, § 33000 et seq.). (*Evans v. City of San Jose* (2005) 128 Cal.App.4th 1123, 1131 [27 Cal.Rptr.3d 675] (*Evans*).) The CRL provides for the creation of redevelopment agencies for cities and counties, establishes procedures for their operation, and prescribes rules for the designation of project areas and redevelopment plans. (11 Miller & Starr, *supra*, Community Redevelopment, § 30B:2, p. 5.) "A redevelopment agency is empowered to prepare and carry out plans for the improvement, rehabilitation, and redevelopment of blighted areas in the city or county, but must act in accordance with the statutory provisions of the CRL. ([Health & Saf. Code,] §§ 33131, 33100, 33112.) A redevelopment agency is unique among public entities in that it works in conjunction with the private sector—private lenders, developers, owners and tenants—in order to achieve the goal of eliminating blight. Furthermore, redevelopment agencies have the ability to use public funds generated by tax-increment financing to subsidize private enterprise. ([Health & Saf. Code,] § 33670.)" (*Evans, supra*, 128 Cal.App.4th at p. 1131.) However, "[s]ince the public purpose justifying the extraordinary powers given to the redevelopment agency by the CRL is to eliminate blight, the essential prerequisite for identifying a project area is that there be blight within the area. . . . The blighting conditions must predominate in such a way as to affect the utilization of the area, causing a physical and economic burden on the community." (*Ibid.*)

Redevelopment plans are subject to rigorous rules that include public agency review, reports, public hearings, and the passing of ordinances

containing specified findings. (*Evans, supra,* 128 Cal.App.4th at p. 1133.) Once adopted, a redevelopment plan is subject to very limited judicial review. (*Id.* at p. 1145.)

■ The CRL confers upon the redevelopment agency the statutory authority to implement a redevelopment plan by exercising the power of eminent domain. (Health & Saf. Code, § 33391, subd. (b).) The CRL may even be applied to authorize the taking and redevelopment of nonblighted properties in a project area if their inclusion is necessary for redevelopment. (11 Miller & Starr, *supra,* Community Redevelopment, § 30B:2, p. 7, citing Health & Saf. Code, § 33321; see *Redevelopment Agency v. Rados Bros.* (2001) 95 Cal.App.4th 309, 318 [115 Cal.Rptr.2d 234] (*Rados Bros.*).)

Significantly, if the redevelopment agency has followed the prescribed procedures in exercising its statutory powers of condemnation, the agency need not identify specific uses for the property it seeks to acquire. Section 1240.010 states that when the power of eminent domain is statutorily authorized for a particular purpose, that purpose is *deemed* a public use. And the CRL stipulates that the redevelopment of blighted areas *is a public use* for which property may be condemned. (Health & Saf. Code, § 33037, subds. (b), (c).)

A central claim advanced by Marina in the trial court and on appeal is that City's condemnation of the property violated the CRL because only the Stockton Redevelopment Agency could exercise eminent domain powers for redevelopment, and then only by following the requisite statutory procedures. However, throughout these proceedings City has consistently denied condemning this property under the authority of the CRL. Thus, in opposing Marina's motion to stay the order for prejudgment possession of the property, counsel for City told the court that Marina's property was not being taken to implement the Stockton Redevelopment Plan.[6] City's redevelopment agency is not party to, and did not participate in, the proceedings leading up to the resolutions of necessity that form the basis of this action. On appeal, City again denies using the CRL to justify this taking.

---

[6] At the hearing, the following colloquy between City's attorneys, Kourtney Vaccaro and Thomas Keeling, and the court took place:

"[MS. VACCARO]: The final point . . . is the City *has never contended that this is implementation of the redevelopment plan.* The City has contended[, however, in the] resolution [of] necessity, that this development is consistent with the redevelopment plan that was adopted for this project area.

"The fact that a redevelopment agency has specific statutory authority to use the power of eminent domain does not preclude the City of Stockton from using *its own separate authority* to exercise the power of eminent domain to acquire property.

"THE COURT: So at the present time, the City is not exercising its power under the redevelopment agency to eliminate blight, and in fact blight is not being alleged here, correct?

"MR. KEELING: *That is correct,* Your Honor." (Italics added.)

We take City at its word. The CRL is inapplicable to this case because City has never purported to condemn Marina's property to implement a redevelopment plan. However, shorn of the protective cloak of the CRL, City's right to acquire the parcels must stand or fall on whether it properly exercised its general municipal authority to condemn private property.

### III. Marina Preserved Its Objection to the Validity of the Resolutions of Necessity

■ The validity of a resolution of necessity may be challenged either by pretrial petition for writ of mandamus or by way of defense to the public agency's right to take once the action has commenced. (§ 1245.255.)

Section 1250.370 provides that a valid ground for objecting to the condemnation is that "[t]he *plaintiff is a public entity and has not adopted a resolution of necessity that satisfies the requirements of Article 2* (commencing with Section 1245.210) . . . ." (§ 1250.370, subd. (a), italics added.) Marina raised such an objection in affirmative defense No. 11 of its answer, which alleged that "[t]he Resolutions of Necessity violate [section] 1245.230 in that they fail to sufficiently identify the public use for which the property is to be condemned."

Moreover, Marina contended throughout these proceedings that City's "project" description was so vague and indefinite that the true purpose of the proposed taking could not be determined. At the city council meeting during which the resolutions were adopted, Marina's representative complained that the City had "no project defined [that] necessitates the taking of [Marina's] property." During her opening statement, counsel for Marina referred to this affirmative defense and asserted that this fatal defect meant the resolutions were "invalid on [their] face." Indeed, it was the ambiguity in the resolutions of necessity, coupled with documentary evidence of plans and negotiations with private developers conducted by City, that led Marina to suspect that the true purpose of the taking was the naked transfer of its property to a private developer.

### IV. An Adequate Project Description Is a Prerequisite to Condemnation

The Eminent Domain Law requires that the local governing entity identify a "project" with a public purpose before it undertakes to condemn private property. (§§ 1240.010, 1240.030.) The proposed project must be described in the resolution of necessity, which is the fundamental predicate to the entire condemnation process. As the Law Revision Commission commented, in recommending that public entities be required to adopt a resolution of

necessity, "The Commission believes that the requirement . . . is a salutary one: In addition to informing the property owner of the authority for the proposed acquisition, it helps to insure that the public entity makes a considered decision of both the *need for the property as well as for the proposed project itself*." (Recommendation Proposing the Eminent Domain Law (Dec. 1975) 13 Cal. Law Revision Com. Rep. (1976) pp. 1026–1027, italics added.)

 There are many reasons why a failure to identify sufficiently the proposed project in a resolution of necessity must have fatal consequences to a public entity's right to take. First, section 1240.030, subdivision (a) "prevents the taking of property by eminent domain unless the public interest and necessity require *the project*. 'Public interest and necessity' include all aspects of the public good including but not limited to social, economic, environmental, and esthetic considerations." (Legis. Com. com., 19 West's Ann. Code Civ. Proc. (2007 ed.) foll. § 1240.030, p. 322, italics added.) The governing body must therefore review the evidence at a public hearing and make the essential findings set forth in section 1240.030. (*Santa Cruz County Redevelopment Agency v. Izant* (1995) 37 Cal.App.4th 141, 148 [43 Cal.Rptr.2d 366].) It is both a physical and legal impossibility for legislators to make a determination that public interest and necessity require "the project," that "the project" is located or planned in a manner consistent with the greatest public good and least private injury, and that the property sought to be acquired is necessary for "the project" (§ 1240.030, subds. (a)–(c)) if the resolution contains no intelligible description of what the project is.

Second, our case law recognizes that compliance with CEQA is mandatory before a public entity may condemn property for a proposed project. Thus, if the public entity fails to prepare a valid EIR or negative declaration for the proposed project prior to condemning the property, the trial court is authorized to dismiss the action. (See *Burbank-Glendale-Pasadena Airport Authority v. Hensler* (1991) 233 Cal.App.3d 577, 595–596 [284 Cal.Rptr. 498]; *City of San Jose v. Great Oaks Water Co.* (1987) 192 Cal.App.3d 1005, 1017–1018 & fn. 5 [237 Cal.Rptr. 845].) A municipality could evade all of these environmental protections by deliberately failing to define "the project" or couching the resolution in such vague language that no one could definitively determine what use the legislative body had in mind for the property.[7]

 Third, identification of the project is an integral component of the property owner's right to procedural due process. A governing body of a

---

[7] The problem is graphically illustrated in the present case. City relied on a 12-year-old EIR to condemn the property, stating in the resolutions of necessity that "[f]urther environmental review" would be required for "any subsequent specific project that may be developed on this site." Only after City filed an eminent domain action and seized possession of the property did

public entity may not adopt a resolution of necessity until it has given the owner proper notice and an opportunity to be heard on all matters that are the subject of the resolution of necessity. (11 Miller & Starr, *supra*, Eminent Domain, § 30A:14, pp. 19–20; see §§ 1245.230, 1245.235; cf. *Conejo Recreation & Park Dist. v. Armstrong* (1981) 114 Cal.App.3d 1016, 1021 [170 Cal.Rptr. 891].) The public entity must engage in a "good faith and judicious consideration of all of the pros and cons of the condemnation issues," and its findings of necessity must be supported by substantial evidence adduced at the hearing. (11 Miller & Starr, *supra*, § 30A:14, p. 20.) If the governing body does not have before it a definable project for which the property is sought to be taken, any discussion of the pros and cons of the condemnation would be an empty gesture and the necessity findings rendered at the conclusion of the hearing would be devoid of real meaning.

Fourth, and finally, an adequate project description is essential to enable judicial resolution of several right-to-take defenses authorized by eminent domain law.

For example, valid statutory defenses to the public entity's right to take include (1) that the plaintiff is not authorized by statute to exercise the power of eminent domain *for the purpose stated* in the complaint; (2) that the *stated purpose* is not a public use; and (3) that the plaintiff does not intend to devote the property described in the complaint to *the stated purpose*. (§ 1250.360, subds. (a)–(c).)

If the "stated purpose" is impossible to identify, the court has no basis for adjudicating any of these defenses. It is inconceivable that the Legislature intended to permit a public entity to circumvent all of these defenses by defining the project in language that is either hopelessly vague or so broad that it encompasses virtually every conceivable public use.

### V. The Resolution of Necessity Does Not Define the Project[8]

Having these principles in mind, we turn to the resolution of necessity adopted by the city council in this case.

Section 1245.230 provides that a resolution of necessity must contain a brief description of the "public use" for which the property is to be

---

a final EIR for the project become available. Thus, the city council had no opportunity to review an updated EIR before determining that taking Marina's property was justified by the public necessity.

[8] Although there were two resolutions, one for each parcel of property, they are identical in all respects. Accordingly, for convenience only, we use the singular noun in this part of the opinion.

acquired. The Law Revision Commission explains the requirement this way: "A statement, for example, that the public use is an 'elementary school and grounds' or 'right of way for a freeway' or 'open space to be maintained in its natural condition' would satisfy this requirement." (Cal. Law Revision Com. com., 19 West's Ann. Code Civ. Proc., *supra*, foll. § 1245.230, p. 421.)

This resolution is woefully lacking in its identification of the project. It begins by pointing out that there are statutes which give City, a municipal corporation, the right to acquire property for "public projects" and recites that the Marina parcel is "necessary for the public project." The resolution then states that "the Proposed Project consists of the *acquisition of additional land in conjunction with potential development* on the North Shore of the Stockton Deep [W]ater Channel." (Italics added.)

The resolution goes on to state that City owns 20 acres in the North Shore area; that the North Shore is a "catalyst site" that is "consistent with" the redevelopment of the Amended West End Redevelopment Project Area; that by "assembling the North Shore parcels, including the Property, into a single parcel, irregularly shaped and undersized lots can be eliminated or minimized, permitting development of a larger and economically feasible use";[9] and that "the Proposed Project" is an integral component of "revitalization and redevelopment" and will "complement other revitalization and redevelopment activities recently completed or that are now being implemented or planned in the Downtown area."

We fail to discern how this language notifies the property owner and the public what project is intended for the property. The project is described as the "acquisition of additional land" in "conjunction with potential development." But to say that the project is the "acquisition of additional land" is the same as saying the project is the condemnation itself. To state that the acquisition is "in conjunction" with potential development or that it is "consistent with" redevelopment activities going on in the area adds nothing, especially since City has renounced the authority to condemn under the CRL.

Finally, section 1245.230 requires a citation to the statute that authorizes the taking. (§ 1245.230, subd. (a).) Rather than referring to a specific statute, the resolution simply trots out a laundry list of statutes setting forth a plethora

---

[9] Despite City's denial that it was relying on the CRL as authority to condemn the property, this language was apparently lifted directly from the CRL. Health and Safety Code section 33031, subdivision (a)(4) describes, as one of the conditions that cause physical blight, "[t]he existence of subdivided lots that are in multiple ownership and whose physical development has been impaired by their irregular shapes and inadequate sizes, given present general plan and zoning standards and present market conditions."

of possible purposes for condemning property.[10] This global, yet evasive enumeration constitutes an implied admission that the city council does not yet know to what use it intends to put the property.

We do not, however, need to rely on inferences. City has conceded in its briefs that it did not have any specific purpose in mind when this condemnation was initiated. According to City, at the time the resolution of necessity was passed, multiple projects were still under consideration and planning for the area "resembled a complicated jigsaw puzzle with its parts still shifting."

City nevertheless claims its project description complied with section 1245.230, given the "generalized nature" of the statutorily required statement of public use. It cites *Anaheim Redevelopment Agency v. Dusek* (1987) 193 Cal.App.3d 249, 263–264 [239 Cal.Rptr. 319] (*Dusek*) for the proposition that an agency need not identify what use is to be made of each parcel it condemns.

*Dusek*, however, is clearly distinguishable because that case involved a condemnation by a city *redevelopment agency*, whose resolution stated that the property was being acquired " 'for the elimination of blight and for redevelopment purposes.' " (*Dusek, supra*, 193 Cal.App.3d at p. 263.) Rejecting the claim that this language was not specific enough, the appellate court held that the public use was established when the redevelopment plan was adopted, at which time the agency acquired the statutory power to condemn property within the redevelopment district. (*Id.* at p. 264.) The result in *Dusek* was compelled by the fact that the redevelopment of blighted areas is *defined* by the CRL as a public use subject to the power of condemnation. (Health & Saf. Code, § 33037, subd. (c).) Since section 1240.010 provides that any purpose declared by the Legislature as one for which the power of eminent domain may be exercised is a valid public use, a statement by the redevelopment agency that the property is being taken for the purpose of redevelopment and eliminating blight was obviously sufficient.

That is not the case here. Because City did not employ the redevelopment agency or redevelopment law to condemn Marina's parcels, it may not take advantage of the safe harbor of the CRL to validate the resolution of necessity. An identifiable "project" with a public purpose must be set forth in the resolution.

---

[10] The resolution cites Government Code sections 37350.5 (property necessary to carry out municipal powers or functions), 37352 (erection and maintenance of municipal buildings), 37353 (parking, public ways or golf courses), 37501 (public assembly or convention hall) and 54031 (parking of motor vehicles), as well as Code of Civil Procedure sections 1240.010 (any purpose specifically declared by the Legislature as one for which the power of eminent domain may be exercised) and 1240.610 (property already devoted to public use if the proposed use is "more necessary" than the one to which the property is appropriated).

Although there is a paucity of California case law dealing with the sufficiency of a project description incident to condemnation, the United States Supreme Court case of *Cincinnati v. Vester* (1930) 281 U.S. 439 [74 L.Ed. 950, 50 S.Ct. 360] (*Vester*) bears substantial resemblance to the one at bar.

In *Vester*, the city proposed to take the petitioners' property as an adjunct to and in furtherance of, a widening of one of its main streets. (*Vester, supra*, 281 U.S. at p. 441 [74 L.Ed. at p. 952].) An Ohio eminent domain statute required the condemning authority to pass a resolution "defining the purpose of the appropriation" (*Vester*, at p. 442 [74 L.Ed. at p. 953]), a provision very similar to section 1245.230, which requires a "statement of the public use" for which the property is to be taken (§ 1245.230, subd. (a)).

The Cincinnati resolution described the purpose of the taking "in the most general terms," i.e., " 'in furtherance of the said widening of Fifth Street' and 'necessary for the complete enjoyment and preservation of said public use.' " (*Vester, supra*, 281 U.S. at p. 443 [74 L.Ed. at p. 953].) As is the case here, the property owners in *Vester* objected on the ground that the city's true intent in condemning the property was to resell their property to private developers. The lower courts sided with the property owners. (*Id.* at pp. 443–445 [74 L.Ed. at pp. 953–954].)

Trying to put a favorable gloss on the vague, general language of its resolution, the city in *Vester* cited a number of public uses to which the property could be put, to which the court retorted: "We are . . . either to assume that whatever the [c]ity, entirely uncontrolled by any specific statement of its purpose, may decide to do with the properties appropriated, will be valid under both the state and [f]ederal [C]onstitutions, or to set up some hypothesis as to use and decide for or against the taking accordingly, although the assumption may be found to be foreign to the actual purpose of the appropriation . . . ." (*Vester, supra*, 281 U.S. at p. 446 [74 L.Ed. at p. 955].)

The Supreme Court in *Vester* refused to engage in either contortion of logic, stating: "The general declaration of the resolution of the City Council . . . is plainly not a definition. *To define is to limit, and that which is left unlimited, and is to be determined only by such future action as the [c]ity may hereafter decide upon, is not defined. The [c]ity's contention is so broad that it defeats itself. It is not enough that property may be devoted hereafter to a public use for which there could have been an appropriate condemnation.* Under the guise of an excess condemnation pursuant to the authority of the constitutional provision of Ohio, private property could not be taken for some independent and undisclosed public use. Either no definition of purpose

is required in the case of excess condemnation, a view of the statute which cannot be entertained, or the purpose of the excess condemnation must be suitably defined. In this view, in the absence of such a definition, the appropriation must fail by reason of non-compliance with statutory authority." (*Vester, supra,* 281 U.S. at p. 448 [74 L.Ed. at pp. 955–956], italics added.)

The principles of *Vester* apply here, where the city council essentially proclaimed: "We are authorized to take this land for a public use. We do not yet know what use that is. Therefore, the proposed project consists of any of the possible uses that are authorized by statute."

A hopelessly obscure description of the project in a resolution of necessity cannot be justified simply because the governing body has incanted every statutorily authorized purpose. A statement that the property is being taken for any or all of the authorized purposes listed in the Government Code or Code of Civil Procedure amounts to a failure to disclose the purpose of the taking.

### VI. The Trial Court Mistakenly Relied on Postresolution Events to Validate the Resolutions of Necessity

In sweeping aside all of Marina's defenses, the trial court relied on the fact that *after* passing the resolutions of necessity, City constructed public projects. In its order granting nonsuit, the court rejected Marina's claim that the project description in the resolutions was insufficient on its face by reasoning that, since the resolutions stated that the land was being acquired for "a public project" and referenced a host of valid public use statutes, and the improvements that were subsequently built by City (a public ball park and parking lot) fit within the definitions set forth in one or more of those statutes, the project description was adequate. The trial judge put it more concisely in his comments at trial: "From a purely pragmatic point of view, the administrative record shows only that the City of Stockton in Resolution of Necessity No. 03-0588 referred to statutes addressing public uses such as parking. Thereafter, a parking lot was constructed and does exist on that parcel. I believe that should end the inquiry."

As we have shown, an adequate project description is essential to the three findings of necessity that are required to be made in all condemnation cases. Only by ascertaining what the project is can the governing body make those findings.

If the trial court's reasoning were correct, no legal challenge could ever be raised against an inscrutable and meaningless resolution of necessity, as long

as the governing body put the property to public use after it was condemned. However, the entire objective of requiring a resolution of necessity is to ensure that the public entity makes a careful and conscientious decision about the need for the project and the need for the property *before* it condemns private property. This purpose would be eviscerated if the validity of a resolution of necessity could be validated by post hoc events.

 Hence, as City concedes, a governing body's postresolution conduct is not relevant to whether a resolution's project description complies with section 1245.230.

### VII. Because the Resolutions of Necessity Are Fatally Defective, Marina's Right-to-take Objection Was Meritorious

 As we have seen, a resolution of necessity that does not identify a project with sufficient specificity, such that persons of ordinary intelligence can discern what the "project" is, cannot support the taking of private property.

A fatally vague statement of purpose in a resolution of necessity also qualifies as a gross abuse of discretion. Section 1245.250 provides that, *except as provided by statute*, the adoption by the governing body of a resolution of necessity conclusively establishes the validity of the three necessity findings set forth in section 1240.030. Section 1245.255, subdivision (b) states: "A resolution of necessity *does not* have the effect prescribed in Section 1245.250 to the extent that its adoption *or contents* were influenced or affected by gross abuse of discretion . . . ." (Italics added.)

A gross abuse of discretion occurs where the public agency acts arbitrarily or capriciously, renders findings that are lacking in evidentiary support, or fails to follow the required procedures and give the required notices before condemning the property. (*City of Saratoga v. Hinz* (2004) 115 Cal.App.4th 1202, 1221 [9 Cal.Rptr.3d 791].) Although the trial court normally determines whether the agency has abused its discretion, the appellate court may resolve the issue where the case turns on undisputed facts and involves a pure question of law. (*Id.* at pp. 1221–1222; *Rados Bros., supra,* 95 Cal.App.4th at p. 317.)

If a resolution of necessity does not contain an adequate project description, the agency cannot make the three findings required by section 1240.030 (public interest and necessity require the project; the project is most compatible with greatest public good and least private injury; and the property is necessary for the project). Consequently, a recitation of statutory findings in

such a resolution is invalid and lacks evidentiary support. Likewise, the adoption of a resolution of necessity that lacks an adequate project description constitutes a failure to follow statutorily mandated procedures.

In *Norm's Slauson, supra,* 173 Cal.App.3d 1121, the public redevelopment agency contracted with a private developer to build condominiums on the subject property before holding a hearing at which it adopted the resolution of necessity. (*Id.* at p. 1125.) Because the condemnation was a foregone conclusion, the hearing was an empty formality. (*Id.* at p. 1127.) The appellate court held that the hearing "was thus affected not by just a gross abuse of discretion but by the prior elimination of any discretion whatsoever. The effect of that abuse was, if not to nullify, to deprive the resolution of any conclusive effect on the three critical issues involved." (*Ibid.*)

The same consequence must ensue where, as here, the agency fails to describe a project in a manner sufficiently specific as to enable it to render necessity findings that are required by law. Since there was no identifiable project, it was impossible for the city council to determine that the public interest and necessity required the taking of Marina's property. Hence, the resolutions of necessity were affected by a gross abuse of discretion, depriving the resolutions of their conclusive effect. (*Norm's Slauson, supra,* 173 Cal.App.3d at p. 1128.)

■ · Finally, because a public agency has no right to condemn in the absence of evidence to support the findings of necessity, and such evidence cannot exist without a sufficient project description, City is unable, as a matter of law, to satisfy its burden of proving that it had the right to condemn the property. (See *Norm's Slauson, supra,* 173 Cal.App.3d at p. 1129.)

An eminent domain complaint must allege compliance with all the statutory requirements, including the requirements of a resolution of necessity. (11 Miller & Starr, *supra,* Eminent Domain, § 30A:16, p. 26.) Because the resolutions of necessity do not conform to the requirements of section 1245.230, the complaint is defective and the action should have been dismissed.

## VIII. Remedy

Having determined that Marina's right-to-take objection was meritorious, it remains for us to decide what remedy is proper.

The Eminent Domain Law provides for two different types of dismissal in this situation. "Section 1260.120 provides that, upon a bench trial of the defendant's objections to the right to take property under eminent domain, if

the court determines the plaintiff does not have the right to acquire by eminent domain, the court 'SHALL ORDER EITHER OF THE FOLLOWING: [¶] (1) Immediate dismissal of the proceeding as to that property. [¶] (2) Conditional dismissal of the proceeding as to that property unless such corrective and remedial action as the court may prescribe has been taken within the period prescribed by the court in the order. . . .' " (*City of Lincoln v. Barringer* (2002) 102 Cal.App.4th 1211, 1233–1234 [126 Cal.Rptr.2d 178] (*Barringer*).)

Subdivision (c) of section 1260.120 goes on to state that "[a]n order made under this paragraph [conditional dismissal] may impose such limitations and conditions as the court determines to be just under the circumstances of the particular case including the requirement that the plaintiff pay to the defendant all or part of the reasonable litigation expenses necessarily incurred by the defendant because of the plaintiff's failure or omission which constituted the basis of the objection to the right to take." (§ 1260.120, subd. (c)(2).)

We asked the parties to brief the issue of the proper disposition of this case if we were to decide that the resolutions of necessity were so vague and uncertain as to deprive City of its right to take the property. Marina's position is that we should order the trial court to issue an unconditional dismissal, with the apparent consequence that the property acquired by City and since put to public use will revert to Marina. City argues for a conditional dismissal, contending that an unconditional dismissal would be "neither feasible nor equitable," would waste taxpayer money, and would cause a massive disruption of what is now a legitimate public use of the property. On this point, we agree with City.

There is no dispute that, having acquired the two parcels, City has put them to public use. City prepared a new EIR for the Stockton Event Center (albeit *after* the subject resolutions were passed) and has constructed municipal projects on both parcels. An unconditional dismissal would result in Marina reacquiring property that has possibly increased in value by hundreds of thousands of dollars as a result of improvements it did not make. It would involve enormous cost to the taxpayers and cause significant disruption to on-going City-run operations. This result is both inequitable and unnecessary.[11]

■■■ Because the Legislature foresaw the possible calamitous consequences of unconditional dismissal in a situation such as the one here, it

---

[11] Marina claims City should bear the consequence of unconditional dismissal because it has no one to blame but itself for failing to proceed according to law. However, the fact that dismissal is required at this late stage is not entirely City's fault. Marina could have challenged the sufficiency of the resolutions of necessity prior to trial by filing a petition for writ of ordinary mandate in the trial court. (§ 1245.255, subd. (a)(1).) It did not do so.

created the safety valve of conditional dismissal as an option. As the Law Revision Commission comment to section 1260.120 states: "Paragraph (2) of subdivision (c) is designed to ameliorate the all-or-nothing effect of paragraph (1). The court is authorized in its discretion to dispose of an objection in a just and equitable manner. This authority does not permit the court to create a right to acquire where none exists, but it *does authorize the court to grant leave to the plaintiff to amend pleadings or take other corrective action that is just in light of all of the circumstances of the case.* The court may frame its order in whatever manner may be desirable, and subdivision (c) makes clear that the order may include the awarding of reasonable litigation expenses to the defendant. See Section 1235.140 (defining 'litigation expenses'). *For example, if the resolution of necessity was not properly adopted, the court may, where appropriate, order that such a resolution be properly adopted within such time as is specified by the court and that, if a proper resolution has not been adopted within the time specified, the proceeding is dismissed.*" (Cal. Law Revision Com. com., 19 West's Ann. Code Civ. Proc., *supra*, foll. § 1260.120, pp. 625–626, italics added.)

In *Barringer*, we held that it was an abuse of discretion for the trial court to order unconditional dismissal where the city had abandoned one, concededly invalid, theory of condemnation but wished to proceed upon another theory, which we referred to as a "Partial Take." We directed the trial court to order a conditional dismissal, permitting the property owners to recover their litigation expenses, but also to permit the city to go forward on the Partial Take theory by following the proper procedures. (*Barringer, supra,* 102 Cal.App.4th at pp. 1233–1238.)

Similar treatment is called for here. Having the benefit and guidance of this decision, City should be afforded the opportunity to adopt new resolutions of necessity for the Marina property containing an adequate description of the proposed projects. On the other hand, fairness and equity require that Marina be awarded its reasonable litigation expenses in defending this action.[12]

---

[12] At oral argument, Marina asserted that it is entitled to restoration of possession and consequential damages by virtue of section 1268.620, which provides that "[i]f, after the defendant moves from property in compliance with an order or agreement for possession . . . , the proceeding is dismissed with regard to that property for any reason or there is a final judgment that the plaintiff cannot acquire that property, the court shall: [¶] (a) Order the plaintiff to deliver possession of the property to the persons entitled to it; and [¶] (b) Make such provision as shall be just for the payment of all damages proximately caused by the proceeding and its dismissal as to that property."

However, the conditional dismissal statute provides for dismissal of the proceeding "*unless such corrective and remedial action as the court may prescribe has been taken* within the period prescribed by the court in the order." (§ 1260.120, subd. (c)(2), italics added.) This language implies that dismissal will not occur unless the public entity fails to comply with the

Because of our disposition, we do not reach the remaining assignments of error, including alleged errors in the valuation phase of the trial. If new resolutions of necessity are passed, an amended eminent domain complaint will have to be filed and the case will have to be tried de novo.

## DISPOSITION

The judgment is reversed. The case is remanded to the trial court to enter an order of conditional dismissal upon such terms and conditions as may be just, including an award of reasonable litigation expenses to Marina. (§§ 1260.120, 1235.140.) Marina is awarded its costs on appeal. (§ 1268.720; Cal. Rules of Court, rule 8.278(a)(1).)

Raye, Acting P. J., and Hull, J., concurred.

A petition for a rehearing was denied March 9, 2009.

---

order for remedial action within the time specified. Thus, section 1268.620, which is only triggered if the action *"has been dismissed"* or a final judgment entered, is inapplicable.